Good morning, everyone. Please be seated. And for those of you standing, I think there might be room for you if you wish to sit. I'm not telling you you have to. But there is some room over here. Rather than stand, that's your choice. We have three cases. We're going to call on the first case now. Case number 12-3470, Pippa Brooks and Sean Tyler. With the lawyers that are going to be presenting argument, please step up and identify yourselves for the record. Good morning. My name is Tara Thompson, and I'll be arguing on behalf of the appellant. Good morning, Ms. Thompson. Good morning, Your Honors. My name is Miles Kelleher on behalf of the people. Mr. Kelleher. All right. Each of you will have approximately 15 minutes to present your oral argument. And from that, Ms. Thompson, you may save some time for rebuttal. Before you start, let me ask you this question. What evidence do you have that this defendant was beaten? There are multiple pieces of evidence in the record to support Mr. Tyler's own testimony that he was beaten. Two other witnesses testified that they saw him thereafter, his mother and a cousin. They both testified that they saw injuries on his face, which is consistent with his testimony that he was beaten. Well, other than his testimony and his mother and his cousin, what other evidence is there? Mr. Tyler was taken to the emergency room after his interrogation. And at the emergency room, they diagnosed him with having been coughing up blood. And one of the pieces of evidence in Mr. Tyler's testimony... But he has a congenital condition of coughing up blood, does he not? Well, that is very much in dispute, Your Honor. There's a portion of the medical record in the case that says that something like history of coughing up blood, but as the expert who gave an affidavit in our post-conviction petition said, that doesn't indicate that he had a lifelong history of coughing up blood. That just reflects that that was a reported condition when he came to the emergency room. Yeah, and he reported that he has a lifetime condition of coughing up blood. That's how it got in the history. It couldn't have gotten there by the tooth fairy or anything like that. He had to say it. Well, it indicates that he told emergency room personnel that he was coughing up blood. It's not listed in the medical history section of that report. This is an issue that's in dispute. And the expert that we presented in the post-conviction petition indicates that that coughing up blood is consistent with him being struck in the chest. And there's no other evidence in the record to connect it with a history of asthma, which is what the state argued in part at trial that it was evidence of. But didn't the expert also agree with the doctor, Dr. Teases, I believe it is, in terms of Dr. Teases' report? Well, she's not, she wasn't disputing, she wasn't disputing everything that Dr. Teases had to say at trial. But Dr. Teases himself didn't address the particular issue about whether this was a history or not a history. And that's part of what she's arguing. But he also indicated that there was no trauma, no abrasions, no contusions when he treated him in the emergency room, correct? And obviously that's not something that – Is that correct? That is correct, Your Honor. And that's not something that obviously someone who's reviewing those records years later would be in a position to contest. That's what he reported. That's what he said. Obviously Mr. Tyler's family reported different information. Where in the record did this other doctor – what's her name? Dr. Gallagher. Where in the record did she say that coughing up blood was consistent with chest trauma? She has an affidavit which is included in our post-conviction report. Right. Where in her affidavit does she say what you're saying? She says that the etiology of coughing up blood is consistent with chest – consistent with being struck in the chest, Your Honor. Okay. And where in the record is that? Her affidavit. Her affidavit where she says it's consistent with being struck. I don't have the specific page of her affidavit in person. I apologize. Okay. But you believe her affidavit specifically states that the coughing up blood is consistent with being struck in the chest. Is that your statement today? That's – I wanted – exactly. That's why I'm asking you. The state seems to suggest that she basically pirated the other doctor's testimony, didn't really contradict him. And so that's why I'm asking you. What exactly did she say that you're saying now says that her opinion was – and this is from reviewing documents 15 years later, correct? That's correct, Your Honor. Yes. That her opinion was that the coughing up blood was consistent with being struck in the chest. I don't have her affidavit. Okay. I don't have the record with me today, Your Honor. All right. But you believe it does say that? I do, Your Honor. All right. While we're on the doctor, how is the doctor's affidavit new evidence since all she really did was review Dr. Teas' report? There's two issues with that affidavit, Your Honor. One issue is that – With Dr. Gallagher's? Gallagher, Your Honor. Gallagher, all right. It supports Mr. Tyler's ineffective assistance of counsel claim because it's true that she is looking at old records and she's not relying on any new medical developments in the field of medicine since Mr. Tyler's trial. She is a witness who could have testified at trial, and so she supports Mr. Tyler's actual innocence claim. But in considering Mr. Tyler's torture claim, his Fifth Amendment claim, it's certainly relevant because, as courts have said, when there's physical evidence to support the fact that someone was tortured, that's relevant. And she is someone who would testify and support that there's physical evidence of Mr. Tyler having been tortured. Well, how would that have been new evidence if she would have examined Mr. Tyler after Dr. Teas' did? It would still be her reviewing his report, right? Because he saw Mr. Tyler in the emergency room. So even if you were able to get Dr. Gallagher's to examine the defendant, it would have been after the fact. She herself, her affidavit is not new evidence that this court could, standing alone, say entitles Mr. Tyler to an evidentiary hearing on whether or not his confession was involuntary. That is certainly true. She's relevant to the new evidence that Mr. Tyler did present, which is this pattern of misconduct by the detectives who interrogated him, Detectives Foley, Clancy, and Mosier, and by the other detectives who were involved in the investigation. It's relevant evidence, but I agree that, standing alone, it doesn't entitle Mr. Tyler to an evidentiary hearing on his pattern of misconduct. Okay, well, how is it new material and likely to change the result? I agree that it's not new. I mean, couldn't anybody really say that if somebody coughs up blood, there's a very good chance it was the result of being hit or struck? That isn't evidence. I mean, couldn't somebody say that it even wasn't a medical factor? That isn't evidence that came out of his trial.  That is not evidence that came out of his trial. Right, but how is it under the umbrella of this Act of Innocence new material and the type of evidence that would likely change the outcome? We're not contesting that it's not new. We agree that this is evidence that couldn't come out of trial. Does it have to be new? No. Our position is this. Certainly for Mr. Tyler to prevail on an actual innocence claim, he has to present evidence that meets the standard that the court just set forth. All right. But at the second stage, doesn't he have to show a substantial deprivation? He doesn't. And isn't that what the court said he didn't do? The court allowed him to proceed on an actual innocence claim only as to the issues with Andrea Murray. And it denied the remainder of his actual innocence. All right. And part of that denial was based on a race to the death claim, wasn't it? A claim that the court found that this had been already decided in a previous appeal? The court's opinion on denying Mr. Tyler the remainder of his claims is not 100% clear, at least to me, Your Honor. What is race judicata? It seems that the court was primarily saying because Mr. Tyler had an opportunity to litigate the voluntariness of his confession, obviously at trial and in a suppression hearing, that he couldn't re-litigate that issue now. All right. And what is your response to that? First, forget about what the court said. The statement suggests that as well. Sure. There is a long history of case law in this district and in the Illinois Supreme Court that race judicata should be relaxed in situations where there is new evidence of a pattern of misconduct by the officers that would be used to impeach their testimony at trial. And that's exactly what Mr. Tyler has presented here. What is that, though? You did actually present some information regarding officers who have absolutely no connection to this case, did you not? Well, respectfully, we disagree that they have no connection to this case, Your Honor. All right. Well, who are they and what is their connection to this case? There are two types of misconduct that are relevant to Mr. Tyler's claims. The first is the pattern of misconduct that's set forth in Mr. Tyler's petition that relates to the detectives who did interrogate him and two of whom denied at trial that he'd been abused. That's Detective Spolian Moser, who testified, and then Detective Clancy, who there's no dispute was with them during the interrogation. And under all the cases on this district, evidence that would impeach those officers' denial is that Mr. Tyler was abused is relevant. All right. But what is the new evidence regarding that? The new evidence is a series of cases in which other people testified, and the evidence we presented in the post-conviction petition is that those people would come to court at an evidentiary hearing and testify that they were abused by those officers during their interrogations. Which officers are we talking about here? Detectives Foley, Moser, and Clancy. And who are these people? There are other people who were interrogated by those detectives. Right. Who are they? Are they in affidavits? Some of the evidence that Mr. Tyler presented is through affidavits. Others is through appellate opinions that report the testimony of those people. There's at least 10 people who testified, or whose evidence is included in the evidentiary record, that would testify that one or more of those detectives interrogated them in the few years that surround when this happened to Mr. Tyler, in the early 90s, that they were interrogated in a similar manner to Mr. Tyler and that they were abused by these detectives, by those three detectives. So we're not talking now about officers who are Brian O'Halloran and Burdell, which is, I believe, what you were stating in your briefs earlier, that those were the officers that had some prior association with these cases that you're talking about. Well, those detectives also are relevant for different reasons. There is an independent pattern of misconduct by the interrogating officers in this case. So we have two sets of officers that abused Mr. Tyler. That's correct. Well, that's not. And let me correct that, Your Honor. The specific officers who interrogated Mr. Tyler are Detectives Foley, Clancy, and Moser. And there is evidence in the record that those particular detectives have a history of misconduct and a history of abusing suspects, abusing young African-American suspects, those three detectives specifically. There is evidence in the record. And that's through a way of, you're saying, court opinions or something? Through their affidavits. Through the affidavits. Through affidavits from the people who say that they were abused. Are they in the record? They are, Your Honor. And what are their names? There are multiple people, including Terry King, Tyrone Hood, Johnny Plummer, Arnold Bay, Dedrick Wormack, Sherman Wormack, Dario Bailey, Harold Hill, Dan Young, and Peter Williams, Frank Bounds, Javon DeWolny, Gregory Lergo. And so the trial judge went to the second stage on the witness claim, correct? The woman that someone went out and talked to. Mr. Tyler had a third stage evidentiary hearing on Andrea Murray and specifically on the Brady issue of whether or not the payments that were made to her were withheld from Mr. Tyler in violation of Brady. And are you still contesting that ruling? We are, Your Honor. All right. Now, going back to the denial of a third stage hearing on the physical coercion, what did the trial court say as to why it was not allowing that to go to a third stage hearing? It said that it was barred by race judicata. All right. And your response is that the cases say that race judicata can be relaxed where fundamental fairness requires. And also where there's new evidence that wasn't heard by the trial court that should cause a reconsideration of that issue. And that's exactly where we find ourselves here. Let's go back to the day when he was in the lockup. You're claiming that he was abused by the police officers, right? But yet there doesn't appear to be any objective evidence in the record to indicate that there was any type of abuse. They took a photograph of him. He went to the emergency room. The ASAs came into the examining room when he was being investigated. And no one noted any abrasions or contusions on his face. And the doctor in the emergency room also indicated that he noticed no abrasions, contusions on his body. So where is this physical abuse, this objective evidence to show that he was physically abused? He testifies that he was abused, and his family members testified to that. I said objective. Well, respectfully, Your Honor, what his family had to say and what he had to say is just as relevant as what a state's attorney testified to, what those detectives denied, and even what medical personnel testified to. They also have observations to offer. Another court might conclude that the evidence from other sources was more credible than what his family had to say. But that can't be credited by this court when no court has considered that the detectives' denials that they abused him should be discredited, given the pattern of this conduct of them doing exactly the same thing in many other cases. And respectfully, to this court, this is not an uncommon situation. This is the case in many cases where people claim that they were tortured. The evidence for it will always be that people denied that that occurred. Frequently, that's the testimony and that will be the record that will be before this court. But that doesn't mean that there's no evidence that, in fact, he was abused. But here we have photographs that doesn't show any abuse, any contusions, any abrasions. We also have a doctor who examined him and also testified that there was no abrasions or contusions. We don't just have individuals giving testimonies to their observations. We have actual records and photographs. We have medical personnel who saw him immediately after this interrogation occurred, essentially. He didn't notice bruising at that time. That's true. And what about the officer in the lockup who said that, number one, he didn't want to go to the hospital when they wanted to take him to the hospital. And he also indicated that he also noticed that there was any abrasions or contusions. That's one piece of evidence for the court to consider, again, in comparison to what Mr. Tyler testified to and what his family testified to. Let's talk about Ms. Murray's affidavit. It's your contention that he should have a new trial because the eyewitness who fingered him later changed her story on an affidavit when there was a third stage hearing. She denies that she changed her story. Well, respectfully, again, the record is more complicated than that, Your Honor. And what we're arguing is that on the basis of the deposition, the evidence deposition that Andrea Murray gave as part of the third stage hearing below, and on the basis of the testimony and the deposition that Mr. Tyler is entitled to a new trial. In that testimony, Ms. Murray clearly recanted some aspects of the affidavit that she signed. There are still new pieces of evidence in that deposition, multiple pieces of evidence that make clear that her trial testimony is not credible. For starters, although Ms. Murray maintained in her deposition before the lower court that she had seen Sean Tyler running through her gangway, she also said that she wasn't sure that she'd seen the other person, which at the time of trial, she said she saw Mr. Tyler's co-defendant with him, someone named Michael Koehler. And in her deposition, she said that that wasn't the case. She said that she was only certain that she'd seen Sean Tyler, not the two people. She also testified at her deposition that when she picked Mr. Tyler out of the lineup, the police told her, good job. She admitted essentially that her continuing identification of Mr. Tyler was tainted by that affirmation that she picked the right person. She agreed that the police showed her Mr. Tyler's photograph at some point, which further goes to the tainting of her ID. She testified that the detectives might have told her that she didn't have a choice about testifying. And she testified at multiple places in her deposition that she felt like she had no choice, that she had to go forward with her testimony. Does the recanting statement that counsel took from her need to be an affidavit? For the court to consider that particular document as evidence, it needs to be a proper affidavit. And it wasn't, was it? Given the record below and the way that the record shook out at the evidence you're hearing, we're not relying on that as a proper affidavit. We're not telling this court to look at that affidavit and say on the basis of the affidavit that Mr. Tyler should receive a new trial. So what are you saying? She gave a sworn evidence deposition as part of the evidentiary hearing. Yes. And didn't she say that she didn't recant and that people came to her house while she was doing things with some other people and that they twisted everything around? That's not what she said. She said that what had been twisted... Well, why wasn't it prepared and sworn to by the lawyers that actually took this statement? Morris Smith, who was an investigator and a notary, testified that he was with Ms. Murray when she reviewed the affidavit, that he was with her when she signed it, and that he discussed it being an affidavit with her. He did not notarize it in her presence. I wasn't there for that. That letter was actually notarized later, wasn't it? That's correct. And that's actually unlawful, isn't it? It's improper. Yes. All right. Now, as far as the... The investigator was a notary. He was. Don't the cases say that, generally speaking, these recantations are not something that have any significant weight? The case law does say that recantations, and I think the language that is used frequently, are inherently suspect. And that language is frequently cited as a basis to not entitle people to third-stage evidentiary hearings on the basis of recantation affidavits. But here, the affidavit isn't the issue before this Court. But she did have a third-stage evidentiary hearing. Well, she gave a sworn deposition where, as I was just enumerating, she listed multiple pieces of evidence, things that were in her affidavit that were true. And she didn't decry the entire affidavit. She didn't claim she didn't sign it. She admitted that there were multiple things in the affidavit that she did tell Mark Smith and that were true, that were different than what she had been testifying to before. So this wasn't... This isn't a situation where there's a complete recantation. Well, actually, it's really not much of a recantation at all because she doesn't in any way go off her identification at all, does she? As far as this defendant. The one thing that she is insistent about in the deposition is that she saw Sean Tyler in the alley. It's not... All right. Let me ask you this about... One of the claims is that her lawyer was ineffective because he wasn't informed that the witness was given money to relocate. Is that part of the ineffectiveness of counsel claim? Mr. Tyler was raising that as a Brady claim. But as an alternative, if the Court concludes his counsel should have... All right. Let's talk about the Brady claim. So the claim is that the State did not advise the lawyer of Sean Tyler that the State moved this woman? Not that they did not advise her that they moved her, but that they... Because they did tell counsel right before the trial that they had preliminarily moved her. There's some specific language in the record about that. Yeah. What does that mean, they moved her? We don't know. And that's what... And Mr. Medea, the trial counsel testified about that in the record, that it is his understanding from what they told him that she had been temporarily moved to Alfield Gardens or to somewhere where witnesses went temporarily. Well, have you ever heard of anyone being moved without it costing some kind of money? That's what Mr. Medea testified to, is that it was not his understanding that it cost money. But he thought that there was some... And that's the lawyer? That's the lawyer. The lawyer was of the opinion that for someone to move from one location to another would not cost money. He thought she had been moved to public housing. He didn't believe... Yeah, but I mean, I'm talking about the actual moving, moving from one location to another location. The lawyer said he didn't understand that that would actually cost money. He did not know that she had been permanently... or that she was going to be permanently moved to another apartment. What about the state's argument that actually what it was was just trial strategy, that if you did inquire about whether or not she was moved and whether or not she got money from the state, that that would impact harmfully on his client? Mr. Medea testified when he was being cross-examined at the out-of-jury hearing that he would not have allowed in evidence that would have gotten him something harmful about gains for his client. And wouldn't that have harmed his client? That is not... I'm sorry. Go ahead. That is not the situation in this case. Andrea Murray testified that she was fearful because people in the neighborhood knew that she was testifying. And she didn't want to be a person in the neighborhood who testified. She didn't testify that she had been threatened by Mr. Tyler. And, in fact, the state lawyer agreed that there was no evidence that she had been threatened by Mr. Tyler, threatened by his family. She didn't even testify that she had been threatened by anyone in the neighborhood at all, but just that she was fearful because she lived in that neighborhood and she was being a witness. So wouldn't that give more credence to her testimony? Wouldn't that cause any more sympathy for her? Wouldn't that maybe open up the juror's eyes and ears and listen to her more intently? Well, it's not clear that evidence about why she was fearful wouldn't even come in below. I mean, clearly, if she's testifying that she was moved and she was cross-examined and asked by defense counsel if she'd been given money by the state or was going to be given money by the state to relocate, the state could have asked her why it is that she's been relocated. It's not clear what evidence would have come in about that and about the move. And what's important about her specifically is that she's the only evidence in the record that appears to corroborate Mr. Tyler's confession. She appeared to this jury as a neutral witness who had no stake in the game. She appeared as a person who had no reason to maintain her identification of Mr. Tyler all this time. If the jury had known that this was because she had been promised that she would be moved by the state, the outcome would have been different. And that's what the line of cases about grading and about payments say, is that payments are material. What about the monetary amount? Does that play a factor here or not? In Blackman, the court never said that there was some specific amount. And to a person, and Andrew Heard herself said that she could not have afforded to move without the state's assistance. Is it their testimony in the record? And in that other case, what was the amount of money that was spent? It was in the tens of thousands. It was $20,000. $20,000. In this case, the actual record indicates it was $1,150. Plus her moving expenses. Plus her moving expenses? She was given two months' rent. A security deposit and a month of rent, which totaled about $1,000. And then her moving expenses, the amount of which the record doesn't indicate what that was. All right. All right. Well, you're going to have to move along here and sum up, and then we'll have, certainly you'll have some time to rebuttal. Is there anything else you want to say? I'll reserve my time for rebuttal, Your Honor. Thank you. Thank you. Mr. Keller, why don't you focus your beginning comments on the denial of moving from a second stage to third stage on the coercion, if you would. She had the third stage on this witness and the recantation. We've heard about that. The witness supplied the trial court through this deposition with numerous reasons to reject the recantation. The statement that was apparently never saw us warned to or whatever. So why don't you focus on the coercion claim? Sure. May it please the Court. The trial judge gave careful consideration to all of the defendant's claims and only determined that two of them warranted a third stage evidentiary hearing. And one of the claims that the trial court determined did not warrant a third stage evidentiary hearing was the claim that defendant's confession was coerced. First of all, the voluntariness of this defendant's confession has already been litigated on direct appeal. And this court found that the totality of the circumstances supported the trial court's finding that defendant's confession was voluntary. And also this court noted that it was not evident that defendant was even injured by it while he was in police custody. There were no signs of mistreatment. Now, defendant, in his post-conviction petition, puts forth this so-called new evidence. But this evidence is insufficient to relax the procedural bar of res judicata. And that is because it's positively rebutted by the record. And the record establishes that defendant made a freely and voluntarily confession. Did this man always contend that he's an innocent person? I mean, he testified at trial that he was somewhere else, he had an alibi witness. He's contending that he's an innocent person that is doing almost a lifetime term from 18 years old and that he didn't do it. He's innocent. Doesn't he maintain that? I believe that, yes, he did maintain that. However, the evidence… Do you honestly believe that this is not an innocent man? I mean, are you sure he's not an innocent man? The evidence here is overwhelming as to his guilt. We had an eyewitness, Ms. Murray, who directly looked out the window after hearing gunshots fired and a mother screaming. She looks right out her window down in the gangway. She sees two men running. But your eyewitness finagled money from the state to move her somewhere, and then she gave an affidavit to the defendant that she lied at trial, and maybe a deal was made and she wasn't paid, and therefore she refutes the affidavit. I mean, is her testimony reliable now after all of this? I will discuss those in more detail, but to answer your question right now, yes, her testimony that she gave at the evidentiary hearing was clearly reliable, credible. The trial judge… Well, how can it be reliable if it's not consistent? First she says this, then she says that. Because the affidavit, as defense counsel concedes, was not proper. The affidavit was made under… It wasn't proper because it wasn't notarized? That's part of it. It was made under dubious circumstances. First of all, Ms. Murray, she has company over. They go over to her house. She admits she's trying to get rid of him. She didn't read it over carefully. She just browsed through it. And Mark Smith, he's a notary public. He doesn't even notarize the affidavit at the time. He can't explain why. He doesn't know why. Yeah, but did she ever say that that was not her signature? No. She admits that she signed the affidavit. She explains why. But what's worse is they bring the affidavit back to the level money law office and then some staff member named Elizabeth Cotter, she notarizes the affidavit. It's not even clear what date she notarizes it, stating that it was sworn and subscribed before her, which was clearly improper. And it not only calls into question the whole contents of the affidavit and the allegations made against Ms. Murray, but also the allegations made against all the police officers in this case. It's inexcusable how this happened. But anyways, Andrea Murray has an opportunity to testify at the evidentiary hearing and she explains the circumstances, how she didn't read it word for word, how the contents of the affidavit did not accurately reflect what she had told to Smith and Horn. She explains how her words were turned around. She says she felt played by Mark Smith and Gail Horn. And I think those words, I can't say it any better. Ms. Murray, she felt played by them. She felt betrayed. She was upset. She was mad at them. And she was adamant that she did not testify falsely at trial. She was adamant that the police did not pressure her to pick out defendant from the lineup. She said she remembered this clear as day. She remembered defendant as one of the persons running through the alley with a gun in his hand. She said she had no doubt. The trial judge, this was an evidentiary hearing. It was up to the trial judge to determine the credible and the witnesses. The trial judge heard Mark Smith's testimony, gave it little weight. But the trial judge. Mr. Kelleher, remind us what the standard of review is from the denial after a third stage evidentiary hearing on the two issues the court proceeded on, Brady and Ms. Murray's recantation in a paper. Yes, it was framed as an actual innocence claim based on Ms. Murray's. But for our purposes of review, how do we look at what the trial judge did when he had an evidentiary hearing and denied a new trial on those two grounds? How do we look at this? This court has to look at the trial court's determination and decide whether it was manifestly erroneous. And what does that mean, manifestly erroneous? Remind us of what that standard says. It's got to be some type of obvious error. Evidence. Yes. The opposite conclusion is clearly evident? Yes. Or it's also been described as arbitrary, capricious? That's correct, Your Honor. Unsupported by fact or law, something like that. There are numerous ways that manifestly against the way it has been described. It's not the least deferential standard review. Abuse of discretion is. But it's the next one. Yes, it's still very deferential because the trial judge did make credibility determinations here. The trial judge specifically articulated that it found Murray's testimony to be credible and clear. It found Clarson's and Merck-Smith's testimony hard to believe. It gave little weight to Ms. Murray's affidavit. Let's go back to the affidavit for a moment. Is it my recollection that the affidavit was already pre-typed? It was already prepared when they went to her house? Yes. It was prepared, pre-typed? Yes. What did it say? What was all the pre-typing and pre-preparation? As far as what was in the affidavit? Well, the affidavit states, in sum, it states that Ms. Murray testified falsely at trial. She received intense pressure by the police to identify her. Oh, so that was all prepared in advance before they spoke to her? Yes. And that came out at the hearing? Yes. And they hung over while she was company over, kind of. Did someone actually admit that? Did someone actually admit that they went to the home of a witness with a prepared statement saying, I testified falsely? That's it. Merck-Smith's testimony, he explains, there were two witnesses who testified about the circumstances surrounding this affidavit. Merck-Smith and Andrea Murray. And wasn't Mr. Smith actually an investigator for a law firm that was suing the officers that are being alleged to have abused Mr. Tyler? That's correct. Merck-Smith, he admitted that he does a lot of work for Lovey & Lovey. They sue a lot of police officers. And he admitted that Lovey & Lovey had litigation against Detectives O'Brien, LLM, Ruger. But he also admitted that he prepared an affidavit in advance before he even spoke to the woman. Or prepared a statement. Because it wasn't an affidavit. It's not clear if Merck-Smith himself prepared it or another attorney. Right, but it was already prepared and written up. That's correct. It's a talked affidavit. They just needed your signature. Have you ever seen any case ever reported in the Illinois Decisions where a witness actually said he went to someone's house with a prepared statement before he talked to the witness and had it all typed up and ready to roll? I'm not aware of any case that has had these circumstances. I'm not either, I was just curious. Is that really the evidence here? That this was the first time he had talked to her? No, Merck-Smith testified that he had had prior conversations with Andrea Murray. He had conversations with her and from those conversations he prepared the affidavit. Isn't that what he testified? Had he spoken to her in person before? Yeah, at one point Andrea Murray did come to the law office. Right, she had been at his law office. He talked around the telephone. This isn't something where somebody brings an affidavit to somebody and never talked to them. It's not an affidavit though. We have a law firm that's preparing statements and has a notary apparently sometime afterward actually notarize a signature, swear that it was actually signed in front of them when in fact it wasn't, which is clearly a violation of the Notary Act. So if Smith's a notary, why didn't he notarize it at the time when she signed it? And Merck-Smith was asked that question during the evidentiary hearing. He couldn't answer it and he couldn't explain why it was notarized later by this staff member from Loveland Lobby. But because as counsel admits, as she concedes, this wasn't a proper affidavit, it doesn't have the trustworthiness and the reliability that the law demands from an affidavit. That's the whole purpose of an affidavit. But do we know how much time transpired from the time when she signed it to when it was actually notarized? And do we know if it was an hour, a day, a week, a month? Merck-Smith could not answer that question. He stated that he did not know the actual date that it was notarized. It does contain a date of June 13th, which is the date that Ward Smith and Gellhorn went to Andrew Murray's house. However, it's not clear whether that was the actual date or not. And Gellhorn is an attorney correct? Yes, that's correct. Okay. I know that even though they had these prior conversations with Ms. Murray, there's no evidence that she had ever seen the contents of this affidavit before that evening when they came to her house. So according to Andrew Murray's testimony, it appears that this was the first time she was seeing it, because she explains later, she says, they twisted my words. My words were turned around. Let me ask you this. Well, after she signed the affidavit, didn't Smith meet with her again with law students of the University of Chicago to see if there was anything additional that she wanted to add? Isn't that what he testified to? I believe he testified something to that extent. However, he was also- Isn't that exactly what he testified to, what I exactly said? I believe so. The trial judge actually found that, of concern that there were law students here and witnessing this, apparently a law student was with them when they went over, and the trial judge was somewhat alarmed, as he should have been, that a young law student is witnessing this improper memorization of an affidavit, and Mort Smith can't explain why, can't explain, and he was asked during the evidentiary hearing, well, why don't you go back with a new affidavit if you knew it was improper? Why don't you go back and do it the correct way? Well, actually, it's more like the legal way. It's actually a violation of the statute to perform a notarization of a signature without that person in front of them. And it's actually subject to certain penalties. But I had asked you to talk about these multiple claims by other individuals regarding other detectives and why we shouldn't proceed or reverse the court's decision not to go to a third stage evidentiary hearing on the allegations of coercion. You can focus back on that. Besides race judicata, where fundamental fairness requires, and certainly we know that if a person is actually innocent, we're not going to stand by and watch. That would be the case where fundamental fairness would require a third stage evidentiary hearing. Yes. In order to support for his claim that his confession was coerced, the defendant puts forth two pieces of evidence. One, Dr. Gallagher's affidavit, and then the alleged pattern of misconduct by investigating officers. And I'll discuss both of them. First of all, counsel has referred to multiple affidavits. So what about those? Forgetting the doctor, she never examined him. I'm not sure what her affidavit is worth or whatever. But let's talk about these other affidavits. Well, the defendant in his testimony, he testifies that he was hit by either Detective Clancy or Detective Moser. So there's really only two detectives that this court should be focusing on, the two detectives that the defendant is accusing of misconduct. Clancy and Moser. That's correct. Yet in the record, it's a voluminous record involving allegations made against Detectives Boudreaux, Halloran, detectives that had no contact with the defendant in the incident case. Absolutely no contact. And then there's allegations made against Detective O'Brien. O'Brien had very limited involvement here. He interviewed a witness named Charles Breckenridge. But Breckenridge didn't identify Defendant Sean Tyler. Breckenridge identified a co-defendant, Taylor. In fact, O'Brien, this investigation, this alleged misconduct occurred on April 1st. O'Brien had the day off of work that day. So he wasn't even involved. And the defense wants to suggest that O'Brien was somehow the leading investigator in this case. There's absolutely no evidence in the record to support that claim. So the first assertion that they make is that it's Detective O'Brien and O'Halloran. And then later on they indicate now that it's Moser and Clancy. I believe yes. That's correct. Well, you said that the defendant said that the two officers that hit him were Clancy and Moser. No one else. Yes, that's correct. And you said that so therefore the focus should be on evidence relating to that. Those two. Yes. All right. And what was that? There is no. The defendant doesn't put forth any evidence. There's no citations in the record about any misconduct caused by Clancy or Moser, aside from the defendant's own testimony at trial. There's no evidence that they had a history. So what the defendant is trying to do is intermingle these allegations made against other detectives who had no involvement in this case, or little involvement, but no contact with the defendant during the time he alleges this misconduct occurred. Well, part of their claim is that co-defendants were beaten by these other detectives. Is that right? The defendant makes all types of claims, but it's not supported by any evidence in the record. And just going back, or discussing Dr. Bellahue's affidavit, here there is no, aside from the defendant's own testimony, there is no evidence that he was even, that he even vomited blood. What about the other cases they cite of similar misconduct involving Clancy, Moser, and Foley? The citation is the, looks like the common law record, 158-65. What about that? That's where we see King, Hood, Plummer, White, Day, Weston, Hill, Young, Williams, Bounds, and Logan. There's no, aside from some allegations, there's no evidence that Clancy or Moser had a history of misconduct. And certainly there's no evidence in this particular case. In fact, the allegations are positively rebutted by the record here. Well, what is 158-65? Are those cases, do you believe, that are cited appellate court cases or something? Or are they affidavits? I believe so. Were these notarized? I'm just curious about it. Were these also like the others, notarized later? I'm not sure about the notarization of those particular documents. However, there was, there's no credible evidence linking any misconduct to Clancy or Moser, aside from allegations that the defendant makes throughout his brief. And oftentimes, you know, rather than even talk about Clancy or Moser, he'll just say, these officers are investigating officers. That's just to kind of mingle them all together. Is the standard of review de novo from the denial, from the second stage? Is our standard of review de novo? Yes, that's the correct standard. However, interestingly, even some of the evidence that came out of the evidentiary hearing calls into question the allegations that the defendant is making against the police officer. And exactly what are you referring to, Mr. Kelleher? Well, in the contents of the Ms. Miller's affidavit, which has been discredited, the defense is essentially trying to smear not only Ms. Murray and her eyewitness testimony, but also the conduct of the police here. They're alleging that they showed her photographs, told her which person's identifying the lineup. They're alleging that certain officers were present, Boudreau, Kelleher. They weren't even present. So, you know, everything in that affidavit should be considered suspect, and I think it should be considered in assessing the other claims, even the ones that were dismissed at second stage. But it is a de novo review. However, the judge properly, the judge looked at all these claims, carefully considered all the claims, and determined that only two of them warranted a third stage evidentiary hearing. And the judge was quite clear. The judge explained in detail. He said that, you know, Halloran and Boudreau were not involved in this case. O'Brien was not present. He had a day off. He said that defendant cannot prove Detective Clancy or Moser used any type of misconduct in eliciting an involuntary confession here. And the medical evidence supports that. The police, once the defendant made this complaint about being sick, they asked him about, you know, well, we'll take you to the hospital. He didn't even want to go. That suggests that he did have some type of history, and he didn't find this to be an alarming event that needed immediate medical attention. But then he did go. He did go. And then when his contents of his stomach were examined, there was no evidence of blood at all. That's correct. Is that correct? That's correct. So then if the bleeding in the stomach somehow would indicate being struck, actually the actual testimony was that there was no blood in his stomach at all. That's correct. And also Dr. Tizzi, who had 11 years of experience, he examines the defendant's chest, face, doesn't see any evidence of bruising. What about the vomit? Was there any objective evidence with regards to the history of vomit? Or Dr. Tizzi? Dr. Tizzi's conclusion was there was no objective information to support the historical statement that the defendant had vomited blood. So there is no, aside from the defendant's own testimony, no one can testify that they saw any vomit or any blood anywhere in this case. Well, I didn't take any diagnostic tests of the stomach to be able to show, you know, I didn't take any diagnostic tests of the stomach. Well, I chose just the opposite. They actually tested the contents of his stomach, which disclosed, did not disclose his presence of blood. What tests did they give his stomach? Well, Dr. Tizzi, I mean, in his medical judgment, determined, He looked at his stomach. I imagine because he didn't find any blood, he made a medical decision, and it was, you know, a reasonable one, that he doesn't need to pursue any additional tests. That's correct. But that's consistent with him not finding any blood. Right. I imagine if he did find blood, perhaps he would have said, Well, maybe now let's do some additional testing to see where that blood is originated from. But he didn't find blood in the first place. All right. Mr. Kelleher, you're going to have to wrap up here. Okay. I would just briefly mention that Dr. Gallagher's affidavit doesn't really add anything to this. I just want to add one thing. When Dr. Gallagher did make a general statement, he said trauma to the chest could cause hematomosis. He didn't say it happened in this case. So really the conclusion from Dr. Gallagher's affidavit is, Well, yes, there's a possibility that it could cause hematomosis, but there's a possibility that hematomosis could also be caused from a non-traumatic event, some other underlying medical condition. So it doesn't really add anything to what Dr. Tizzi already explained at trial. So Dr. Gallagher's affidavit, aside from that being new evidence, it's not of such substantial character that it would probably change the result at retrial. For all these reasons, as well as devastating that brief, the people respectfully request that this honorable court affirm the ruling of the trial court. All right. Thank you. Counsel. Thank you. The court partially addressed this issue already, but I want to make the record absolutely clear. When Ms. Murray's affidavit was taken, this was not the first time that either Mork Smith or the attorney had spoken with her. Mork Smith had spoken with her at least two other times, including a long meeting where she gave a bunch of information to Mr. Murray and to the attorney. And in fact, Gallagher's notes of one of those original meetings had to be turned over to the state in this case. So this isn't a situation where someone shows up with a typed aspirational affidavit to a witness. The affidavit was based on the prior meetings that Mr. Smith and Ms. Horne had with this witness. In fact, the record shows that she was to be at his office that day and didn't show up, and that's why they went out to the house. Isn't that what the record shows? It does. And what would you suggest is the reason that, that when she actually gave a deposition, she indicated all these things. For example, that my testimony that I saw of Tyler was correct. It wasn't untrue. That the police detectives did not suggest to her whom she should identify. Her testimony that she never said the money that was used to move her was dirty money. What would you suggest that why that occurred when she actually gave a deposition? Well, she did testify in her deposition that the detectives did tell her that they had arrested two people that were in the lineup. But more to the court's point, this, because it's also clear in her deposition what's going on. She testified that Morg Smith told her that she probably wouldn't be needed further in the case. That was her understanding of what Morg Smith had told her. And she testified that when Morg Smith showed up with a subpoena to appear at an evidentiary hearing, she would understand that she was very unhappy about that. She didn't want to appear further at these proceedings. There was then a meeting that she had with the state's attorney's office. And clearly, this is a person who didn't want to participate in these proceedings anymore. And she felt, when she testified, that she felt played, that she felt used. This is a person who thought, I can tell my story at this point and move on with my life. And when she was needed at an evidentiary hearing, she didn't want to be a witness anymore. It's a person who didn't appear to court, who actually didn't have a warrant issued. That's in her deposition. She testified that she was told that she didn't have to participate any further and that she was unhappy when she received a subpoena from Morg Smith. That's in her deposition. And obviously, she's not saying, therefore, I'm lying now. But that is an inference that one could draw from the testimony that she gave. Obviously, that is not the inference that the lower court drew. I mean, we have the factual record and the findings of her credibility that the lower court found before. There's plenty of reason to find, and we've laid this out in the brief, why that's manifest error. And more importantly, though, why there's still enough. Why is it manifest error? The court found that Ms. Murray hadn't reviewed her affidavit before she signed it. There's corrections from Ms. Murray on every page of the affidavit. So clearly, she was going through the typed version with Mr. Smith. She was making corrections. She was making edits. Do you know that that's normally the routine that someone would go to someone's home with everything typed out in advance and then have them look at it and sign it? Is that normally how this Morg Smith operated? If they had been spoken to multiple times and it was understood what the witness was saying and if they were supposed to appear at an office. Well, why didn't they do that when she was at the office, right then and there? They had her right there. Why didn't they type it up that day when she was cooperating and wanted to be there? Why didn't they prepare the affidavit that moment in front of all those lawyers and law students, have her sign it, have it sworn to in front of a notary, right then and there? Why wasn't that done? That evidence isn't in the record. She clearly met with them for a long time. But it could have been done, right? Instead, they waited and then they go to her house some day. I mean, it could have been done, couldn't it? The evidence in the record is that when she met with them at the office the time before, that she met with them for a very long period of time. Right. Why didn't they record it? Why didn't they videotape it? Why didn't they put it all down in writing that day? Strike while the iron is hot. There she was, exposing all the lies. Why didn't they do it that day in the office, get an affidavit, have it properly signed? Why didn't they do it? The record doesn't indicate that, Your Honor. All right. So there's no reason why they didn't do it. No good, credible reason why they didn't strike while the iron was hot. When the woman was in their office telling them all these things about how she lied. Right? She had met with them for a very long time. Did they record anything that day? Did they videotape it? Did they type it up and ask her to sign it? They didn't, Your Honor. All right. But her deposition in this case is the ultimate record about what Andrea Murray had to say. And on the basis of that deposition, well, maybe the court found that it couldn't believe her testimony after an evidentiary hearing. It couldn't believe, I'm sorry, Mort Smith's testimony because it could have easily have been recorded that very day that he believed her in her deposition. And you're saying that's manifest error. And we should be able to say that the court's conclusion in denying a new trial on the Brady and on this witness is manifest error. I'm saying that on the basis of what she testified to in her deposition and all of the things that she acknowledged that were in the deposition that she is maintaining are true. But on the basis of those pieces of new evidence from Ms. Murray that this court should grant Sean Tyler a new trial. All right. And that's manifest error. All right. And then you have your, why don't you wrap up with your, the second issue regarding whether the court erred when it refused to set the concession aspect of the case, the actual innocence, to a third stage evidentiary hearing. We talked at length today about the physical injury. Physical injury, although for all the reasons that we've argued, there's evidence of a physical injury here. As this court knows, it's not required. It's not required to grant someone an evidentiary hearing, and it's not required to find that they were tortured. There's evidence here. It's disputed. It's not a clear record. There's people on both sides of this issue. But there is new evidence of a pattern of misconduct by Foley and Clancy and Mosier. And although two of those officers were the people that Mr. Tyler testified actually abused him, the third person was present. And the First District has already held in people versus Jakes that if someone else is there but they're not doing the beating,  What about the argument that originally McClaren was saying it was O'Brien and O'Hara and Boudreau that were the officers that were abusing him and caused his confession? And then it was that pattern that was the new evidence. I'd like to clarify that issue for the court, so thank you for the opportunity. It's not that he's claimed that the other detectives abused him. But what Mr. Tyler has said consistently is that the pattern of misconduct by those other officers is relevant. It's relevant to the motive in this case and why these detectives would have targeted him in the first place. And this is everything that's in the record with respect to Marcus Wiggins. Boudreau and Howard and O'Brien were involved in the Marcus Wiggins case. They were listed on Mr. Tyler's arrest report. They were involved in interrogating his co-defendants. They were involved, some of those officers were involved in speaking to Andrew Howard. And wasn't that presented to the trial court? Did the trial court consider that testimony and evidence? As to Mr. Wiggins? Yes. No, in fact, that's part of the issue in this appeal is that Mr. Tyler is that Marcus Wiggins' trial attorney told Mr. Tyler's trial attorney that there was an issue with respect to Marcus Wiggins and advised trial counsel to look into that, that there was a basis for Sean Tyler having said that he was targeted by these officers, that he was abused. That's something that Sean Tyler's trial attorney never did. It's something that Mr. Tyler did not get to present to the world court below because that's an issue that didn't make it to the evidentiary hearing on his post-conviction petition. And that was presented to him before the trial? There's an affidavit from Mr. Was that presented to him before the trial? His trial counsel was told there's an issue with Marcus Wiggins that you should investigate. Because she had been Mr. Wiggins' trial counsel and knew that there had been this protective order entered to protect Mr. Tyler from those other detectives. And was it in trial counsel's testimony during the examination that it was trial strategy not to pursue that? We weren't allowed to address that at the evidentiary hearing. It didn't come up because that's not an issue that we were allowed to proceed to an evidentiary hearing on. Anything further? You know, I just have one question. The defendant in his testimony of abuse, did he specify which officers struck him in the chest and which officers slapped him in the face? He testified that those, and we know from the record that those two officers were the ones that did it, but he didn't say who did what, did he? He didn't, Your Honor. In closing, the court can grant Mr. Tyler two types of relief. It can remand for an evidentiary hearing those issues which he did not have a third stage hearing on below. And it can grant him a new trial on the issues that were considered at the third stage evidentiary hearing. Mr. Tyler is entitled to both kinds of relief. So we ask the court to take appropriate steps to resolve Mr. Tyler's case. Thank you. All right. The case was well argued and well briefed. We'll take it under advisement.